UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**CHARI JILL ROSS**,                                      Case No. 1:12 CV 543

         Plaintiff,                                  Magistrate Judge James R. Knepp II

  v.                                                        MEMORANDUM OPINION AND
                                                ORDER

**COMMISSIONER OF SOCIAL SECURITY**,

         Defendant.

### INTRODUCTION

Plaintiff Chari Jill Ross filed a Complaint (Doc. 1) against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying disability insurance benefits (DIB). The district court has jurisdiction under 42 U.S.C. § 405(g). The parties consented to the exercise of jurisdiction by the undersigned in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 9). For the reasons below, the Court affirms the Commissioner's decision denying benefits.

### PROCEDURAL BACKGROUND

On May 15, 2009, Plaintiff filed an application for DIB and alleged a disability onset date of November 30, 2008, claiming she was disabled due to bipolar disorder. (Tr. 84, 100). Plaintiff's claim was denied initially (Tr. 43) and on reconsideration (Tr. 48). Plaintiff requested a hearing in front of an administrative law judge (ALJ). (Tr. 53). One month prior to the ALJ hearing, on June 20, 2011, Plaintiff wrote a letter to the ALJ indicating she was in the hospital (for a thoracotomy), wished to waive her right to be present at the administrative hearing, and for the hearing to proceed in her absence due to her "dire medical and financial situation". (Tr. 31, 79). She authorized her attorney to make any necessary decisions regarding her case. (Tr. 79).  After the hearing, where

Plaintiff's counsel and a vocational expert (VE) appeared, the ALJ denied Plaintiff's claims. (Tr. 11-23). The ALJ found Plaintiff had severe impairments but they did not meet or equal a listed impairment in 20 C.F.R. Part 404, Subpart P, App. 1. (Tr. 16). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 6); 20 C.F.R. §§ 404.955, 404.981. On March 6, 2012, Plaintiff filed the instant case. (Doc. 1).

## FACTUAL BACKGROUND

Born January 29, 1959, Plaintiff was 49 years old when the ALJ made his determination. (Tr. 21). Plaintiff has a college education and worked as a steel salesperson for eighteen years. (Tr. 101, 105). She reported her bipolar disorder prevented her from working because she could not concentrate, had racing thoughts, could not get out of bed or shower, and "it [was] ruining her life." (Tr. 100, 112).

Concerning Plaintiff's daily activity, she reported eating breakfast around 10:00 a.m., and said she tried to make sales calls from 10:00 a.m. to 4:00 p.m.[1], ate dinner at 5:30 p.m., watched television, and tried to go to sleep around midnight. (Tr. 112). She also fed her two birds and cleaned their cages, but said her boyfriend did most of the work. (Tr. 112). Plaintiff reported she did not cook, but microwaved TV dinners, although she was hardly ever hungry. (Tr. 113). Plaintiff lived in a house with her significant other. (Tr. 111). She cleaned bathrooms and dusted, but had to be reminded to do so by him. (Tr. 114). Plaintiff stayed home as often as possible because she felt safe there. (Tr. 114). When she did go out, she went alone and could drive herself independently. (Tr. 114). Plaintiff said she talked on the phone three times a week and attended family functions, but

---

1. Plaintiff reported she worked in an office for 25 years until the owner of the company asked her to try working from home. (Tr. 112).

she did not enjoy being out socially. (Tr. 115).

Plaintiff indicated she could not pay bills, handle a savings account, use a checkbook, or concentrate, but she could count change. (Tr. 115). She said she could concentrate on something for an hour if it interested her. (Tr. 116). She said she had a very hard time following written instructions but could follow spoken instructions, although she did not like authoritative figures telling her what to do because it would lead to a confrontation. (Tr. 116).

Plaintiff's mother provided a third-party function report and stated she and Plaintiff talked on the phone daily and spent two days a week together sitting and talking. (Tr. 122). She said Plaintiff worked from home as a salesperson and she took care of her significant other and their two birds. (Tr. 122-23). She reported Plaintiff could not sleep and did not go out because she could not handle crowds. (Tr. 123). She said Plaintiff cooked TV dinners and cleaned the house once a week. (Tr. 124-25). She also reported Plaintiff could manage money, pay bills, and handle a savings account. (Tr. 125). She reported Plaintiff talked to others on the phone four days a week and when she did go out, went independently. (Tr. 125-26).

### *Medical Evidence*

<u>Mental Impairments and Substance Use</u>

On March 8, 2008, Plaintiff was brought to the emergency room at South Pointe Hospital after her live-in boyfriend found her in an unresponsive state. (Tr. 218). She was admitted for overdosing on Xanax and cocaine. (Tr. 218). She tested positive for marijuana, cocaine, benzodiazepines, and opiates. (Tr. 211). Plaintiff had not been psychiatrically hospitalized before but she had seen Dr. Wilkes at South Pointe for bipolar disorder. (Tr. 218). On examination, Plaintiff denied suicidal ideation and her memory was intact, but her concentration was impaired and her

speech was rapid. (Tr. 218). She admitted she had used powder cocaine on a regular basis for several years. (Tr. 254). She was diagnosed with bipolar disorder, mixed, and Dr. Wilkes ordered Plaintiff be admitted to the psychiatric unit at South Pointe. (Tr. 218). Plaintiff was prescribed Depakote, Abilify, and Ativan, remained stable, tolerated her medicine regimen, and was discharged March 13, 2008. (Tr. 222, 254).

On May 9, 2008, Plaintiff was admitted to the psychiatric unit of Lutheran Hospital for depression and was treated by Dr. David Muzina. (Tr. 174, 176). He noted Plaintiff suffered from a recent benzodiazepine overdose and had a severe history of substance abuse. (Tr. 174). She tested positive for cocaine, benzodiazepines, and opiates. (Tr. 238). He prescribed Seroquel to help with mixed mood and anxiety, and gave her a principal diagnosis of bipolar disorder, mixed. (Tr. 174). She was transferred out of the psychiatric unit for treatment of lung problems on May 14, 2008. (Tr. 168).

On June 25, 2008, Plaintiff returned to Dr. Muzina for a follow-up and medication management. (Tr. 183). Plaintiff reported she "loved the Seroquel", slept better, was calmer, and her mood was stable. (Tr. 183). She was diagnosed with bipolar affective disorder, mixed, partial remission and assigned a Global Assessment Functioning (GAF) score of 61-70[2]. (Tr. 183).

On August 11, 2008 Plaintiff saw Dr. Muzina for a medication check-up. (Tr. 268). Plaintiff reported ongoing weight gain and sedation from Seroquel. (Tr. 268). She denied racing thoughts or

---

2. The GAF scale represents a "clinician's judgment" of an individuals symptom severity or level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders*, 32–33 (4th ed., Text Rev. 2000) (*DSM-IV-TR*). A higher number represents a higher level of functioning. *Id.* A GAF score of 61–70 reflects some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships. *Id.* at 34.

concentration problems, did not indicate she was depressed, and did not describe irritability or euphoria. (Tr. 268). Dr. Muzina noted Plaintiff's "[m]edical issues seem[ed] resolved for the most part." (Tr. 268). She reported she slept twelve hours a day and enjoyed it, but knew it was excessive. (Tr. 268). Plaintiff said she was working full-time but business was slow. (Tr. 268). She said she wanted to taper off Seroquel because it made her tired. (Tr. 268).

On September 3, 2008, Plaintiff returned to Dr. Muzina and reported "I have my energy back!" after switching  from Seroquel to Abilify. (Tr. 270). There was no reported mania, depression, or mood symptoms. (Tr. 270). Her mental status exam was "entirely within normal limits". (Tr. 270).

Plaintiff saw Dr. Muzina on March 17, 2009, and reported she stopped taking Abilify because of its side effects, specifically muscle aches. (Tr. 272). She reported increased symptoms such as irritability, sleep problems, and "having strange energy along with tiredness and depression." (Tr. 272). On examination, Plaintiff was overactive and agitated but otherwise normal. (Tr. 273). She said she was not able to work and "with the current economy [wa]s feeling very stressed out." (Tr. 273). She was diagnosed with bipolar disorder, most recent episode mixed moderate. (Tr. 273). Dr. Muzina adjusted her medication regimen and prescribed Geodon. (Tr. 273). He assigned her a GAF score of 51-60[3].

On June 9, 2009, Plaintiff went to Dr. Muzina and reported improvement in anxiety and depression but still felt irritable and had racing thoughts. (Tr, 276). She tried to take a job as a bartender, hated it, and quit. (Tr. 276). She felt better overall but acknowledged the need for further

---

3. A GAF score of 51–60 reflects moderate symptoms (e.g., flat effect and circumstantial speech) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *DSM-IV-TR,* at 34.

improvement in symptoms and functional level. (Tr. 276). Dr. Muzina increased her Geodon
prescription. (Tr. 276).

Plaintiff returned to Dr. Muzina on July 7, 2009 accompanied by her mother. (Tr. 278). Her
mother claimed Plaintiff had been using drugs like THC, cocaine, and Percocet, and was irritable
and having mood swings. (Tr. 278). When alone, Plaintiff admitted to using THC and cocaine and
reported she had not been taking her Geodon as prescribed. (Tr. 279). Dr. Muzina discussed with
Plaintiff the effect of recreational drug use on her mental health. (Tr. 279). He assessed her GAF was
51-60, and instructed Plaintiff to stop using recreational drugs because he planned to randomly test
her for drugs and would discharge her from treatment if she continued to use them. (Tr. 279).

On July 29, 2009, Dr. Wilkes reported he had first seen Plaintiff on October 31, 2007, and
had most recently seen her on March 10, 2008. (Tr. 294). Dr. Wilkes described Plaintiff's clinical
mental abnormalities of rapid pressured speech, disorganized thoughts, and dramatic affect. (Tr.
295). He opined Plaintiff had high average intellect, intact memory, mild impairment in orientation,
and fair frustration tolerance. (Tr. 295). He said she had no restrictions of daily activities,  minimal
impairment of her interests, habits, and self care, and "minimal to no[]" problems with social
interaction. (Tr. 295). He diagnosed her with bipolar disorder and cocaine abuse. (Tr. 296). Dr.
Wilkes opined Plaintiff would be able to tolerate work related stress if she were taking her
medication and not using drugs. (Tr. 296).

On February 14, 2010, Plaintiff was taken to Hillcrest Hospital after her mother found her
lethargic and on the floor. (Tr. 318, 320). Plaintiff tested positive for cocaine, benzodiazepines,
phencyclidine, and PCP. (Tr. 318, 430). She was given a sedative upon arrival due to her "marked
agitation". (Tr. 318). Her change in mental status was found "likely" secondary to drug use. (Tr.

6

430). Plaintiff was treated with fluid hydration and Ativan to counteract drug withdrawal. (Tr. 319, 430). On February 16, 2010, Plaintiff began experiencing chest pain and x-rays revealed an electatic lung at the right lung base. (Tr. 368). A portable feeding tube was administered on February 18, 2010. (Tr. 365). She was also treated for pneumonia. (Tr. 430). She felt better, her pneumonia resolved, and she was discharged February 21, 2010. (Tr. 430).

On March 1, 2010, Plaintiff's mother and sister brought her to the emergency room at Hillcrest Hospital for a possible panic attack. (Tr. 382). She reported anxiety, chest pain, and shortness of breath. (Tr. 391). Plaintiff denied using drugs but admitted to occasional marijuana use. (Tr. 391). Plaintiff's family was present and said Plaintiff was lying about her drug use and that she had been abusing drugs for the past 30 years. (Tr. 391). Plaintiff tested positive for PCP, cocaine, and benzodiazepines. (Tr. 391). Later Plaintiff admitted to smoking marijuana laced with PCP, and said she was "tripping". (Tr. 395). Plaintiff reported feeling extremely anxious with frequent mood changes. (Tr. 391). She reported she attempted suicide recently by taking 50 Valium. (Tr. 395). Five days after admission, Plaintiff was stabilized and discharged in satisfactory condition to North Coast Psychiatric Hospital (North Coast). (Tr. 382). At North Coast, Plaintiff was prescribed Lamictal and participated in group therapy. (Tr. 444). "She was motivated to participate in drug programs and [] [be] involve[d] with 12-step program in the hospital." (Tr. 444). When discharged March 26, 2010, Plaintiff's mental status was clean, steady, alert, and oriented; her memory within functional limits; her affect appropriate; her mood even; her thought process linear and goal directed; and she was sleeping well and getting along with others. (Tr. 444). She had been diagnosed with bipolar II, depressed, and polysubstance dependence. (Tr. 445). Her GAF was 54 at discharge.

On March 10, 2010, Plaintiff and her family had a meeting with Connections staff to

7

discuss mental health and substance abuse treatment. (Tr. 459). At her initial interview on March 11, 2010, Plaintiff was very impulsive and distracted throughout the session and in a hurry to leave. (Tr. 457). "She seemed more upset at her family and the lack of control she fe[lt] she has with them." (Tr. 457). "She shared some information that seemed to downplay the effects of her illness on her judgment and insight and tended to be mildly narcissistic about the opinions of others and their reasons for being involved [with her treatment]." (Tr. 458). Her demeanor was hostile, mistrustful, preoccupied, and demanding. (Tr. 547). Plaintiff reported she took 7.5 grams of cocaine two times per week, Percocet daily, and Valium three to four times per day. (Tr. 454). Plaintiff's GAF was 50[4] and she was diagnosed with mood disorder, bipolar disorder, cocaine dependancy, and opiate dependancy. (Tr. 455).  On April 24, 2010, Plaintiff reported improvement in her mood and overall functioning. (Tr. 465).

On September 13, 2010, Plaintiff left her session at Connections early, reporting she had an interview for a cleaning job. (Tr. 477). She reported she was doing well and her medication was working, stating Lexapro was "a 'pleasure'". (Tr. 477). Her mood and affect were "great" and "bright". (Tr. 477). On October 4, 2010, Plaintiff presented at Connections as an "emergency walk-in." (Tr. 475). She said she had been caught shoplifting the week prior and was "manic" at the time. (Tr. 475). She said she had been compliant with her medication but relapsed one month earlier. (Tr. 475). When Plaintiff was told a toxicology screen would be ordered, she admitted to using heroin two days prior and Percocet the day before. (Tr. 475). Dr. Thomas noted Plaintiff was more irritable toward her than usual when discussing her drug use. (Tr. 475).

---

4. A GAF score of 41–50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *DSM-IV-TR*, at 34.

On November 1, 2010, Plaintiff's symptoms were stable and Plaintiff reported she was doing "good" and was "pretty calm". (Tr. 473-74). She attended dual diagnosis group meetings and AA meetings. (Tr. 473). She said her medications were working, she did not feel manic anymore, and she had not used drugs. (Tr. 473).

On June 7, 2011, Plaintiff underwent a psychiatric consultation while she was hospitalized with "profound respiratory failure", later diagnosed as community-acquired pneumonia, likely due to inhaling substances, sepsis, and respiratory failure. (Tr. 583). She tested positive for PCP, benzodiazepines, and opiates. (Tr. 583). Plaintiff said she had stopped taking her bipolar medication as of May 25, 2011. (Tr. 584). She admitted using heroin once per week and also abused opiates. (Tr. 584). On examination, she was alert and oriented, her affect was irritable, and her insight and judgment were fair. (Tr. 585). Dr. Feldman diagnosed Plaintiff with bipolar disorder, depressed episode, and Lamictal was increased. (Tr. 585). Her GAF score was 50-60. (Tr. 585).

On July 14, 2011, Plaintiff was admitted to Lutheran Hospital for suicidal ideation. (Tr. 488). She was rapidly stabilized and her dosage of Lamictal was increased. (Tr. 488). She was discharged two days later with a diagnosis of bipolar disorder. (Tr. 488).

Respiratory Impairment

Plaintiff was admitted to Lutheran Hospital from May 14 to May 21, 2008. (Tr. 168). Initially she was admitted to the psychiatric unit for management of her bipolar disorder, but the emergency room found a large pleural effusion, which was diagnosed as empyema. (Tr. 168). Plaintiff underwent a thoracotomy to remove the collection of pus in a space between her lung and inner surface of her chest wall, as well as a middle lobe removal. (Tr. 168). Plaintiff was treated with IV antibiotics and Percocet for pain, and she clinically improved during her stay. (Tr. 169). Her final

9

diagnoses were empyema without fistula, unspecified pleural effusion, asthma, essential hypertension, and bipolar disorder. (Tr. 169). Plaintiff was discharged in stable condition to a skilled nursing facility. (Tr. 169).

On March 4, 2009, Plaintiff went to Dr. Balasubramanian complaining of cold symptoms, congestion, and a cough. (Tr. 193). Plaintiff reported she smoked approximately five cigarettes per day. (Tr. 193). Her lungs were clear to auscultation and her chest x-ray was normal. (Tr. 194-95). She was diagnosed with an acute upper respiratory infection, not otherwise specified. (Tr. 194).

On May 13, 2009, Plaintiff's chest x-ray revealed no acute pulmonary disease or significant interval change as compared with her March 4, 2009 x-ray. (Tr. 223). Plaintiff was diagnosed with bronchitis. (Tr. 224).

On September 15, 2008, Plaintiff saw Dr. Botham for drainage of fluid in her right chest wall. (Tr. 288). A CT scan of Plaintiff chest revealed chronic obstructive pulmonary disease (COPD) with mild interstitial pulmonary fibrosis. (Tr. 289). There was complete resolution of the pleural effusion on the right side. (Tr. 289).

On May 25, 2011, Plaintiff was admitted to Hillcrest Hospital for severe respiratory problems. (Tr. 483). Dr. Ashraf diagnosed pneumonia, which was likely community acquired due to inhaling substances. (Tr. 484). Treatment notes indicated Plaintiff abused heroin by inhalation. (Tr. 640). Plaintiff was also diagnosed with a complicated pleural effusion, sepsis, and respiratory failure. (Tr. 484). On May 31, 2011, Dr. Botham performed a total left chest decortication. (Tr. 480). Plaintiff tolerated the procedure well and Dr. Botham was hopeful Plaintiff would recover from her extensive left chest empyema. (Tr. 480). Plaintiff was discharged to a skilled nursing facility on June 16, 2011, and discharged to her home July 1, 2011. (Tr. 479, 489).

Opinion Evidence

On August 17, 2009, Karen Steiger, Ph.D., reviewed Plaintiff's medical records and assessed Plaintiff's mental residual functional capacity (RFC). (Tr. 300-14). She opined Plaintiff was mildly restricted in her activities of daily living; had moderate difficulties maintaining concentration, persistence, or pace; moderate difficulty in social functioning; and one or two episodes of decompensation, each of extended duration. (Tr. 311). She found Plaintiff could perform simple or moderately complex tasks when duties were predictable and did not require rapid or consistent pace. (Tr. 300). She also said Plaintiff would perform optimally when social interaction was infrequent. (Tr. 300).

On April 28, 2010, Karla Voyten, Ph.D., reviewed Plaintiff's medical records and noted Plaintiff's mental symptoms increased with medication noncompliance and drug use. (Tr. 446). She observed Plaintiff' mental status exams were normal in the absence of drugs and with medication compliance. (Tr. 446). Dr. Voyten affirmed Dr. Steiger's prior assessment. (Tr. 446).

On July 12, 2010, Crystal Thomas M.D., a physician at Connections, completed an assessment of Plaintiff's mental capacity to perform work activities. (Tr. 461-62). Dr. Thomas assessed that Plaintiff had a "poor" ability to follow work rules, use judgment, maintain attention and concentration, deal with the public, relate to co-workers, work with others, or deal with stress. (Tr. 461-62). She found Plaintiff had a "fair" ability to understand, remember, and carry out complex job instructions, socialize, and relate predictably in social situations. (Tr. 462). She had a "good" ability to understand, remember, and carry out detailed or simple job instructions, maintain appearance, leave home alone, function independently without supervision, and maintain regular attendance and be punctual within customary tolerances. (Tr. 461-62).

11

Dr. Thomas filled out a similar questionnaire for Plaintiff August 9, 2010 and indicated Plaintiff was now mainly "fair" in all the categories mentioned above. (Tr. 463-64). There was no explanation for the divergence in functional limitation. Dr. Thomas noted Plaintiff suffered from bipolar disorder and she was "currently unable to hold a regular job due to mental illness." (Tr. 464).

***ALJ Hearing & Decision***

On July 19, 2011, Plaintiff's attorney appeared at the ALJ hearing. (Tr. 31). She confirmed Plaintiff was in the hospital for a thoracotomy. (Tr. 31). When questioned by the ALJ regarding whether Plaintiff would supplement the record, her attorney responded that there was enough in the record to make a determination and she considered the record closed. (Tr. 32).

The ALJ posed a hypothetical to the VE indicating a person with Plaintiff's vocational characteristics who was able to perform simple and moderately complex tasks with predictable duties that did not require a rapid or consistent pace, and involved frequent social interactions and no concentrated exposure to pulmonary irritants. (Tr. 35). The VE responded that the hypothetical individual would be capable of performing thousands of light and sedentary unskilled jobs in the national economy. (Tr. 35-36).

In a decision dated September 8, 2011, the ALJ found Plaintiff had severe impairments, but those impairments did not meet or medically equal a listed impairment in 20 C.F.R. Part 404, Subpart P, App. 1. (Tr. 16-19). Specifically, the ALJ summarized Plaintiff's mental health records, drug abuse, and medication noncompliance and determined Plaintiff did not meet or medically equal the criteria of listings 12.04 and 12.09. (Tr. 16-19). In making this determination, the ALJ considered whether Plaintiff met "paragraph B" criteria. (Tr. 18-19). To satisfy "paragraph B" criteria, the mental impairments must result in at least two of the following: marked restriction of

activities of daily living; marked difficulties maintaining social functioning, marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. (Tr. 18). The ALJ found Plaintiff had only mild restrictions in her activities of daily living. (Tr. 18). He based this conclusion on Plaintiff's report that she worked from home, took care of two birds and cleaned their cages, was able to drive and go out alone, could follow written instructions, and could pay attention to something for an hour if it interested her. (Tr. 18).

The ALJ found Plaintiff had moderate difficulties in social functioning and based this on Plaintiff's report that she talked on the phone three days a week, and had no problems getting along with family, friends, or neighbors. (Tr. 18). With regard to concentration, persistence, and pace, the ALJ found Plaintiff had moderate difficulties because she said she could not pay bills, handle a savings account, or use a checkbook, even though her mother reported she could. (Tr. 18-19).

The ALJ found Plaintiff had experienced two episodes of decompensation, which were of extended duration, including her hospitalization at North Coast, even though she had tested positive for cocaine and PCP. (Tr. 19). After concluding Plaintiff did not have at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, he found the evidence also failed to establish the presence of paragraph "C" criteria.

The ALJ then found Plaintiff had the following RFC:

> [Plaintiff can] perform a full range of work at all exertional levels but with the following nonexertional limitations: she must avoid concentrated exposure to pulmonary irritants. She is able to perform simple and moderately complex tasks where duties are predictable and do not require rapid or consistent pace. She would perform optimally where social interactions are infrequent.

(Tr. 19).

Based on VE testimony, the ALJ found jobs existed in significant numbers in the national

economy that Plaintiff could perform. (Tr. 22).

### STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for SSI and DIB is predicated on the existence of a disability. 42 U.S.C. § 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. §§ 404.1520 and 416.920 – to determine if a claimant is disabled:

1.      Was claimant engaged in a substantial gainful activity?

2.      Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.      Does the severe impairment meet one of the listed impairments?

4.      What is claimant's residual functional capacity and can claimant perform past relevant work?

5.      Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) & 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

### DISCUSSION

Plaintiff asserts the ALJ should have found she met listing 12.04 based on certain GAF scores, Dr. Thomas' opinion that she was unable to work, and because she had at least three episodes of decompensation. (Doc. 13, at 7-10). Plaintiff also asserts the ALJ erred by failing to seek additional evidence. (Doc. 13, at 10-12).

15

***Listing Impairment 12.04***

In order to establish disability due to a mental impairment on the basis of medical evidence, a claimant must satisfy one of the nine diagnostic categories for mental impairments contained in 20 C.F.R., Part 404, Subpt. P, App. 1, § 12.00. *Abbott v. Sullivan*, 905 F. 2d 918, 923 (6th Cir. 1990). Most of the listings impose two requirements: first that the claimant has particular signs or symptoms; and second, that the symptoms result in a specified degree of functional limitation. *Abbott*, 905 F. 2d at 923. The symptoms are found in paragraph A for each listing and, hence, are referred to as "paragraph A criteria". *Id*. The "set of impairment-related functional limitations" are contained in paragraph B of the listings and are referred to as "paragraph B criteria". App. 1, § 12.00. Here, Plaintiff asserts she satisfies the criteria of listing 12.04, specifically bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes. *See* App. 1, § 12.04. There are additional functional criteria in paragraph C for listing impairment 12.04. App. 1, § 12.00. However, "paragraph C criteria" are assessed only if paragraph B criteria are not satisfied. *Id*. A claimant has a listed impairment if the diagnostic description in the introductory paragraph and the criteria of both paragraphs A and B (or A and C, when appropriate) of the listed impairment are satisfied. *Id*.

Paragraph B criteria for listing 12.04 require that two of the following restrictions exist in order for disability to be found at this stage: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or, repeated episodes of decompensation, each of extended duration. 20 C.F.R., Part 404, Subpt. P, App. 1, § 12.04. In order to meet Paragraph C criteria, a claimant must prove: repeated episodes of decompensation, each of extended duration; a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in

16

the environment would be predicted to cause the individual to decompensate; or, a current history of one or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement. *Id.*

Here, the ALJ found Plaintiff did not meet paragraph B criteria because she was only mildly restricted in her activities of daily living due to Plaintiff's self reports of cleaning, cooking, caring for her pet birds, driving a car, making sales calls, and watching television. (Tr. 18, 112-16). The ALJ found Plaintiff had only moderate difficulties with social functioning because she got along with family, friends, and neighbors, visited with her mother regularly, lived with her significant other, and talked to others on the phone. (Tr. 18, 115, 122). The ALJ also found Plaintiff had only moderate difficulties with concentration, persistence, or pace because she reported she could count change, she could concentrate for an hour if something interested her, she could follow written and spoken instructions, and her mother reported Plaintiff could manage her money. (Tr. 18-19, 116, 125).

Plaintiff alleges the ALJ erred and she met listing 12.04 based on certain GAF scores, Dr. Thomas' opinion that she was unable to work, and at least three episodes of decompensation. (Doc. 13, at 7-10). Each are considered in turn.

GAF scores

The Sixth Circuit explained a GAF score is "a subjective determination that represents the clinician's judgment of the individual's overall level of functioning." *Oliver v. Comm'r of Soc. Sec.*, 415 F. App'x 681, 684 (6th Cir. 2011) (*quoting White v. Comm'r of Soc. Sec.*, 572 F. 3d 272, 276 (6th Cir. 2009)). A GAF score is thus not dispositive of anything in and of itself, but rather only significant to the extent that it elucidates an individual's underlying mental issues. *Oliver*, 415 F. App'x at 684; *see also* 65 Fed. Reg. 50746, 50764-65 (2000) ("The GAF scale ... does not have a

17

direct correlation to the severity requirements in our mental disorders listings."). Therefore, GAF scores should be considered with all of the evidence, but are not dispositive on the issue of disability. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 511 (6th Cir. 2006) ("[W]e are not aware of any statutory, regulatory, or other authority requiring the ALJ to put stock in a GAF score in the first place.").

Here, Plaintiff argues the ALJ erred by not taking into account Dr. Feldman's GAF score assessed on June 7, 2011, when Plaintiff was hospitalized for respiratory issues, and Dr. Thomas' GAF score on March 11, 2010, when she was a patient at Connections. Plaintiff asserts Dr. Feldman gave Plaintiff a GAF score of 50, when in fact Dr. Feldman actually rated Plaintiff's GAF score at 50-60, indicating only moderate symptoms. (*See* Tr. 585). Moreover, at that time, Plaintiff admitted she had stopped taking her bipolar medication and was using heroin once a week. (*See* Tr. 584). And while Dr. Thomas assigned Plaintiff a score of 50 initially, Plaintiff improved dramatically when she took prescribed medication, indicating she felt "great", and said Lexapro was working. (Tr. 477). Although Plaintiff's condition subsequently regressed, it was due to her resumption of illegal drug use. In addition, when Plaintiff did not take drugs and complied with her medication regimen, treating psychiatrist Dr. Muzina rated Plaintiff's GAF score at 60-71, and indicated she was in partial remission for bipolar disorder. However, when Plaintiff resumed drug use and stopped taking medication, she was assigned a score of 51-60, which still only indicated moderate symptoms.

Plaintiff's GAF scores are consistent with the ALJ's finding that Plaintiff's mental functioning was good when she did not take illegal drugs and was medication compliant. Further, the GAF scores Plaintiff cites still only indicate moderate symptoms, not the marked restrictions required by listing 12.04.  Accordingly, Plaintiff's GAF scores do not show Plaintiff met the criteria for listing 12.04.

18

Connections - Dr. Thomas

A treating physician's opinion is only entitled to controlling weight when it is well supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the case. 20 C.F.R. § 404.1527(c). Here, the ALJ explained Dr. Thomas' opinions – that Plaintiff had poor functioning and was unable to hold a regular job due to mental illness – were not entitled great weight because there was a lack of evidence or clinical findings in support of Dr. Thomas' limitations. (Tr. 21).

As Plaintiff points out, the ALJ observed Dr. Thomas did not mention the effects of Plaintiff's drug use on her mental status, making her opinion somewhat insubstantial. Dr. Thomas was aware of Plaintiff's drug use because it was reflected in her treatment notes. After relapsing, Plaintiff presented to Dr. Thomas as an "emergency walk-in". (Tr. 475). Initially, she lied to Dr. Thomas about her drug use. (Tr. 475). When Dr. Thomas told her she would have to undergo a toxicology screen, Plaintiff admitted to using heroin and opiates. (*See* Tr. 475). Plaintiff also admitted she had stopped taking her bipolar medication. (Tr. 475). Further, Dr. Thomas' treatment notes reflect Plaintiff's positive social capacity when she was not on drugs and medication compliant. During a counseling session with Dr. Thomas, Plaintiff reported she had been taking her medication, felt "great", and left early for a job interview. (*See* Tr. 477).

Further, the evidence is clear Plaintiff's mental symptoms were well-controlled with treatment and did not require functional limitations as severe as Dr. Thomas claimed. Her mental status exams were fairly normal when she complied with treatment and abstained from drug use. (Tr, 183, 268, 270, 273, 296, 477). Dr. Wilkes, Plaintiff's treating psychiatrist from 2007 to 2008, opined Plaintiff had a high average intellect, intact memory, and a fair frustration tolerance. (*See* Tr. 295). He found she had no restrictions of daily activities and minimal to no problems with social

19

interaction. (Tr. 295). He concluded Plaintiff would be able to tolerate work related stress if she were taking prescribed medication and not using drugs. (Tr. 296). In fact, Plaintiff reported she worked from home making sales calls from 10:00 a.m. to 4:00 p.m. While Plaintiff said she was not successful at that time, it still required a level of social functioning above "poor".

Further, Dr. Muzina noted Plaintiff's bipolar disorder was in partial remission when she was medication compliant and not using drugs. (*See* Tr. 183). However, when she resumed illegal drug use, Dr. Muzina discussed with Plaintiff the effects recreational drugs had on her mental health and threatened to discharge her from treatment if she continued abusing them.

Because Dr. Thomas' opinions were not supported, inconsistent with the record, and not entitled to great weight, they do not show Plaintiff suffered from such "marked" restrictions as required by listing 12.04.

Decompensation

Plaintiff also argues she meets listing 12.04 because she had at least three episodes of decompensation. (Doc. 13, at 9-10). In order to meet listing 12.04, Plaintiff must prove she had repeated episodes of decompensation, each of extended duration. The regulations mandate:

> The term repeated episodes of decompensation, each of extended duration in these listings means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks. If you have experienced more frequent episodes of shorter duration or less frequent episodes of longer duration, we must use judgment to determine if the duration and functional effects of the episodes are of equal severity and may be used to substitute for the listed finding in a determination of equivalence.

20 C.F.R., Pt. 404, Subpt. P, § 12.00C4.

The regulations specifically note that any functional limitations, including episodes of decompensation, must be the result of a mental disorder described by the listed impairment. 20 C.F.R., Pt. 404, Subpt. P, § 12.00A.

The ALJ found Plaintiff had one to two episodes of decompensation of extended duration attributable to her mental impairment. (Tr. 17). Specifically, he found Plaintiff's stay at North Coast, even though precipitated by drug abuse as opposed to bipolar disorder, was considered an episode of decompensation of extended duration. (Tr. 19).

Plaintiff argues her February 14 to February 20, 2010 hospitalization at Hillcrest Hospital constituted an episode of decompensation. (Doc. 13, at 9). However, the this was not of extended duration because it was less than two weeks. Moreover, Plaintiff presented for a panic attack, shortness of breath, and chest pain. (Tr. 391). Initially, Plaintiff denied using drugs until her family indicated she was lying. (Tr. 931). Later, Plaintiff admitted she had been smoking marijuana laced with PCP and was "tripping", and she tested positive for PCP, cocaine, and benzodiazepines. (Tr. 391). Therefore, in addition it not being extended in duration, her stay at Hillcrest was attributable to her drug use, not a result of a mental disorder described by the listings. Plaintiff's hospitalization from July 14 to July 16, 2011, while attributable to her mental impairment, was too short to be considered extended duration and was therefore not an episode of decompensation.

Plaintiff also suggests her illegal drug use and noncompliance with medication, in itself, should be considered to constitute episodes of decompensation. (Doc. 13, at 9-10). Plaintiff relies on *Spiva v. Astrue*, 628 F. 3d 346 (8th Cir. 2010), to assert that the ALJ "ignores the reality of bipolar disorder" and keeping patients on medication and free of drugs is part of the problem facing physicians dealing with bipolar patients. (*See* Doc. 13, at 9). However, *Spiva* dealt with a schizophrenic plaintiff who did not take his medication because he could not afford it, and it was noted the drugs used to treat schizophrenia "can make a patient feel drowsy and stunned." *Id*. Here, there is no indication Plaintiff could not afford her medication, and she consistently noted its positive effects. In Plaintiff's case, the negative side effects reported were slight and the medication

was adjusted immediately.

For example, while Plaintiff reported to Dr. Muzina that she "loved the Seroquel", she later indicated it made her tired. (*See* Tr. 183, 268). Dr. Muzina successfully switched her to Abilify and Plaintiff reported, "I have my energy back!" (See. Tr. 268, 270). She then reported she had stopped taking Abilify because it gave her muscle aches and she was prescribed Gideon. (Tr. 272-73). However, at the next appointment, attended by Plaintiff's mother, Plaintiff admitted she had been using drugs and had stopped taking Gideon. (*See* Tr. 278-79). Plaintiff did not report she stopped taking Gideon from negative side effects. Rather, it was clear Plaintiff stopped taking her medication because she had been abusing drugs, evidenced by Dr. Muzina's warnings about the effects recreational drug use had on her mental health. (Tr. 279).

Plaintiff also suggests she abused drugs and was noncompliant *because of* her bipolar disorder. This is undoubtedly not the case. Rather, the record reflects Plaintiff had a severe history of drug abuse spanning 30 years and her bipolar disorder was directly affected by it, not the cause of it. And despite years of support from her family, Plaintiff continued to use drugs and stop taking medication, which caused an increase in symptoms. This is not only evidenced by Plaintiff's mental health, but her respiratory health as well. Plaintiff underwent two severe respiratory surgeries, the last of which was likely induced by inhaling substances. Still, Plaintiff continued to use drugs, and her health, both mental and physical, continued to deteriorate because of it.

An impairment remedied by treatment cannot serve as a basis for a finding of disability. *Harris v. Heckler*, 756 F.2d 431, 436 (6th Cir. 1985). The regulations mandate, in relevant part, when a claimant does "not follow prescribed treatment . . . . without good reason" he will not be found disabled. 20 C.F.R. § 404.1530. Good reason includes refusal based on religious beliefs, refusal of repeated surgery to accommodate the same medical issue, and refusal of treatment based

on magnitude of risk. *Id*.

Though the Eighth Circuit suggested noncompliance with medication could be justified by mental illness, *see Pate -Fires v. Astrue*, 564 F. 3d 935, 945-47 (8th Cir. 2009), it has since clarified its position by holding noncompliance by mentally ill claimants will be justified when there is some evidence linking the mental illness to the noncompliance. *See Wildman v. Astrue*, 596 F. 3d 959, 966 (8th Cir. 2010).

As noted above, Plaintiff did not provide any evidence linking her mental illness to noncompliance, and therefore, she did not provide good reason for noncompliance. Rather, the evidence shows she continually used illegal substances that exacerbated the condition she asserts disables her. The Court does not intend to undermine Plaintiff's objective struggle, but the Social Security Act did not repeal the principle of individual responsibility. *See Sias*, 861 F.2d at 480. And while the Court sympathizes with Plaintiff, it cannot reach beyond the law and award disability, especially when Plaintiff has the obvious ability to remedy the very impairment from which she suffers. As the Sixth Circuit surmised in *Sias*:

> Each of us faces myriads of choices in life, and the choices we make, whether we like it or not, have consequences. If the claimant . . . chooses to drive [her]self to an early grave, that is [her] privilege--but if [s]he is not truly disabled, [s]he has no right to require those who pay social security taxes to help underwrite the cost of [her] ride.

*Sias*, 861 F.2d at 480.

 Plaintiff does not satisfy the criteria of listing 12.04[5], and substantial evidence supports the ALJ's finding that she did not meet or medical equal listing 12.04.

---

6. While not argued by Plaintiff, she does not qualify for listing 12.04 under paragraph C criteria for the same reasons her treatment notes do not reflect the requisite episodes of decompensation for paragraph B criteria, as described above.

23

***Duty to Develop the Record***

Plaintiff argues the ALJ failed to fulfill his duty to develop the record because he had insufficient information about her Lutheran Hospital visit beginning July 14, 2011, and her continuing treatment at Connections. (Doc. 13, at 10). She also alleges she never waived her right to be present at her administrative hearing. (Doc. 13, at 10).

An ALJ has a duty to develop the record because of the non-adversarial nature of Social Security benefits proceedings. *See Heckler v. Campbell*, 461 U.S. 458, 470 (1983). The Sixth Circuit has emphasized that this duty is particularly important when a claimant is acting *pro se*.  *See Lashley v. Sec'y of Health & Human Servs.*, 708 F.2d 1048, 1051 (6th Cir. 1983). The duty to develop the record, however, is balanced with the fact that "[t]he burden of providing a complete record, defined as evidence complete and detailed enough to enable the Secretary to make a disability determination, rests with the claimant." *Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986) (citing 20 C.F.R. §§ 416.912, 416.913(d)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999) (explaining claimant's burden to prove disability).

Here, Plaintiff was represented by counsel. *See Glenn v. Sec. of Health and Human Servs.,* 814 F. 2d 387, 391 (7th Cir. 1987) (When an applicant is represented by counsel, an ALJ may assume she is making her strongest case for benefits).  The ALJ specifically gave Plaintiff's counsel the opportunity to supplement the record with any additional evidence she felt necessary to prove Plaintiff's disability. At the administrative hearing, the ALJ asked Plaintiff's counsel, "[D]o you have any new or additional exhibits which need to be offered?", and Plaintiff's counsel responded, "No, sir." (Tr. 32). Referring to Plaintiff's hospitalization at Lutheran Hospital, the ALJ continued, "[W]hat's going on with her now? Do you intend to supplement the record?", and Plaintiff's counsel responded, " I think there is enough in there about that, Your Honor." (Tr. 32).

24

Plaintiff asserts the ALJ failed to develop the record regarding Plaintiff's Connections records. Specifically, she indicated in her *pro se* Appeals Council letter that before he discounted the findings of Connections physician, "the ALJ should have referred the matter back to Connections for additional and/or further information." (Tr. 4). However, an ALJ only has a duty to recontact a physician if the evidence in the record is insufficient to make an informed determination, not when the evidence is insufficient to make a favorable determination. *Daniels v. Astrue,* 2010 WL 599634, at *2 (E.D. Ky. 2010) (quotations omitted). Here, the ALJ discounted Dr. Thomas' opinion because it was not supported and inconsistent with the evidence, not because it was insufficient. Further, as noted above, the ALJ asked Plaintiff's counsel, "[D]o you have any new or additional exhibits which need to be offered?", and Plaintiff's counsel responded, "No, sir." (Tr. 32).

Plaintiff also argues the ALJ failed to develop the record because it lacked her testimony. She argues the ALJ erred because she was not at the ALJ hearing and "she never waived her right to be present." (Doc. 13, at 11). Not so.

On June 20, 2011, Plaintiff received a Notice of Hearing letter in which the ALJ advised Plaintiff it was important for her to attend the hearing and testify about her case. (Tr. 64, 67).  This Notice of Hearing letter also informed Plaintiff she could request a postponement of her administrative hearing. (Tr. 65). On June 16, 2011, Plaintiff signed an Acknowledgment of Receipt, and indicated she would be present at her hearing. (Tr. 78). However, on June 20, 2011, Plaintiff mailed a letter to the ALJ stating specifically, "I am currently hospitalized . . . . I will not be available for the hearing set on July 19, 2011. Because of my dire medical and financial situation, I respectfully request that the hearing proceed . . . without me. *I specifically waive my right to attend and testify* and authorize my attorneys to make any necessary decisions regarding my case". (Tr. 79) (emphasis added). At the hearing, the ALJ referred to Plaintiff's June 20, 2011 letter and asked

25

her attorney, "And you want to proceed without her presence and have a decision without her testifying. Is that right?", and Plaintiff's counsel responded, "That's correct, Your Honor." (Tr. 31).

While Plaintiff now claims she wanted to be at her administrative hearing, never waived her right to be present, and did not discuss the issue with her attorney, there is no evidence in the record to suggest Plaintiff's waiver of appearance was not knowing or voluntary. Plaintiff is a college educated woman and was a successful salesperson for eighteen years. Indeed, instead of asserting she did not knowingly or voluntarily waive her right, she falsely stated she did not waive it at all. The foregoing belies any argument Plaintiff has concerning the ALJ's failure to develop the record concerning her waiver of testimony.

## CONCLUSION

Following review of the arguments presented, the record, and applicable law, the Court finds substantial evidence supports the ALJ's decision. Therefore, the Court affirms the Commissioner's decision denying benefits.

IT IS SO ORDERED.

s/James R. Knepp, II<br>
United States Magistrate Judge

26